<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DIANNE MARIE PIERCE | Civil Action No. 15-01956 (SDW) |
| Plaintiff, | |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | April 25, 2016 |

**WIGENTON,** District Judge.

Before this Court is Plaintiff Dianne Marie Pierce's ("Plaintiff") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Hilton R. Miller's ("ALJ Miller") denial of Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. This Court has subject-matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons set forth below, this Court **REMANDS** this matter for further review.

1

## I.   PROCEDURAL AND FACTUAL HISTORY

### A.  Procedural History

On November 16, 2011,[1] Plaintiff applied for SSI alleging disability as of January 1, 2011 due to schizoaffective disorder, and cocaine and opioid abuse in partial remission.  (*See* Tr. 12, 91, 191, 492.)  During a hearing before ALJ Miller on May 29, 2013, Plaintiff amended her onset date to February 1, 2012.  (Tr. 30-31, 190.)  Plaintiff's claims were denied both initially and upon reconsideration.  (Tr. 82-90, 92-100.)  ALJ Miller granted Plaintiff's subsequent request for a hearing, which he held on May 29, 2013.  (Tr. 27, 112-14, 126.)  Plaintiff appeared and testified at the hearing.  (*See* Tr. 31-45.)  On June 25, 2013, ALJ Miller issued a decision finding Plaintiff not disabled and denying her claim for SSI.  (Tr. 12-23.)  On January 16, 2015, the Appeals Council denied Plaintiff's request for review of ALJ Miller's June 25, 2013 decision, making it the Commissioner's final decision.  (Tr. 1–5.)  Plaintiff now requests that this Court reverse the Commissioner's decision or, alternatively, remand for a new hearing.  (Pl.'s Br. 1.)

### B.  Factual History

#### 1.  *Personal and Employment History*

Plaintiff is fifty-one years old and lives in Jersey City, New Jersey with her daughter, her daughter's boyfriend, and her grandchild.  (Tr. 37, 91.)  Plaintiff completed the eighth grade, and she obtained her GED in the 1990s.  (Tr. 49-50.)  In 2006, Plaintiff worked at Kentucky Fried Chicken ("KFC").  (Tr. 32-33, 99, 215.)  She was also previously employed as a warehouse worker and a construction worker.  (Tr. 215.)

#### 2.  *Medical History*

---

[1] A discrepancy appears in the administrative record as to the date of Plaintiff's application for SSI.  (*See* Tr. 91, 191.)  For the purposes of this Opinion, this Court treats November 16, 2011 as the date when Plaintiff applied for SSI.

2

Plaintiff has a long history of drug addiction: she first used cocaine at age nineteen, crack at age twenty-two, and heroin at age twenty-four.  (Tr. 285.)  While Plaintiff completed an intensive outpatient drug abuse program in March 2012, she tested positive for opiates a month later in April 2012.  (Tr. 30, 447, 459, 482.)  In July 2012, Plaintiff sought treatment at a detoxification center because she had sniffed fifteen bags of heroin per day.  (Tr. 463, 465, 467, 478.)  The medical record consists of examination reports from in-patient and out-patient psychiatric centers, treating psychiatrists, and a Social Security Administration ("Administration") consultative psychiatric examiner.  (*See* Tr. 443-81.)  Additionally, two consultative psychologists reviewed Plaintiff's medical evidence and submitted reports.  (*See* Tr. 82-90, 92-100.)  Plaintiff testified about her health during a hearing before ALJ Miller.  (*See* Tr. 32-45).  Plaintiff also submitted two function reports, and her daughter submitted a third party function report.  (*See* Tr. 223-38, 249-56.)  The following is a summary of the medical evidence:

### a. *Brookdale Family Care Center and Jersey City Medical Center Reports*

Psychiatric examination reports from Brookdale Family Care Center ("Brookdale"), dated from May 2009 to April 2011, reveal Plaintiff's struggles with depression and drug abuse.  (*See* Tr. 296-374.)  During visits to Brookdale's Outpatient Mental Health Clinic, Patricia M. Okaine, R.N., N.P. ("NP Okaine"), reported Global Assessment of Functioning[2] ("GAF") scores ranging from forty-five to sixty, indicating moderate to serious symptoms or impairment. (*See* Tr. 296, 299-300, 304, 307, 310-12, 315.)  NP Okaine also reported in a May 2009 visit that Plaintiff

---

[2] Physicians use the Global Assessment of Function ("GAF") scale to report on a patient's level of functioning on a scale of 1 to 100.  (*See Diagnostic and Statistical Manual of Mental Disorders IV* (*DSM-IV*) 31-34 (4th ed. 2000)) ("51-60[:] Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)[;] 41-50[:] Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)").

complained of chronic "non-command voices of screaming/noise." (Tr. 373.) Plaintiff visited the emergency room at Jersey City Medical Center on September 8, 2011, and again on September 9, 2011, after a psychologist from Urban Behavioral Health referred her. (Tr. 378, 376, 406.) During the September 8th visit, Plaintiff complained of "voices [that] are getting louder" and "yelling and screaming in her head." (Tr. 407-08) (internal quotation marks omitted.) Plaintiff also indicated that she had not taken her medications for three months and that she had not been on opiates for seven months. (Tr. 407-08.) Jersey City Medical Center discharged Plaintiff from the September 9th visit on September 13, 2011, when she reported that she felt "great" and that the voices had gone away. (Tr. 380, 382) (internal quotation marks omitted.) Dr. Nirmala Rakakumar, M.D., diagnosed Plaintiff with Schizoaffective disorder with "chronic [and] acute exacerbation," and "Opioid type dependence" (Tr. 379), and he prescribed her Risperdal, Prozac, Cogentin, and Ambien. (Tr. 382.) In follow up visits to Jersey City Medical Center on September 16, 2011 and October 12, 2011, Plaintiff reported "[n]o problems" or complaints with the medication. (Tr. 436-37, 440.) However, during a December 20, 2011 visit, Plaintiff reported that she used drugs six times in December and she stated that "[she] continue[s] to use drugs." (Tr. 448, 451) (internal quotation marks omitted.)

### b. Plaintiff's Treating Psychiatrist Reports

Psychiatrist Dr. Royston Cruickshank, M.D. ("Dr. Cruickshank"), treated Plaintiff multiple times in 2012. (See Tr. 460-81.) In June 2012, Dr. Cruickshank diagnosed Plaintiff with schizoaffective disorder, bipolar disorder, and opioid dependence with "[p]eriods of disorganized thoughts, depression[,] and delusional thinking." (Tr. 480.) Dr. Cruickshank opined that Plaintiff could not work an eight-hour work day, that Plaintiff is a likely candidate for SSI, and that Plaintiff's disability would last twelve months or more. (Tr. 480-81.) On July 2, 2012, Plaintiff

4

received detoxification treatment and she was discharged on July 15, 2012.  (Tr. 459.)  During

these July visits, Dr. Zdena Rubin, M.D. ("Dr. Rubin"), reported that Plaintiff sniffed fifteen bags

of heroin per day for twenty years and that she was homeless.  (Tr. 476, 478.)  While Dr. Rubin

reported during the July 2, 2012 visit that Plaintiff denied auditory or visual hallucinations, she

measured Plaintiff's GAF at forty-five, which is consistent with serious psychiatric symptoms.

(Tr. 477); *see supra* note 2.  In a July 5, 2012 progress note, Intern Mark Doering, M.A., L.A.C.,

L.C.A.D.C. ("Intern Doering"), reported that Plaintiff "continues to reside at St. Lucy's shelter

and continues to pursue stable housing."  (Tr. 457.)  During a group therapy session at Jersey City

Medical Center on July 10, 2012, Plaintiff reported abstinence from drugs and alcohol, and

indicated that she had "unstable housing issues."  (Tr. 457.)  In the discharge note from July 27,

2012, a physician noted that Plaintiff actively participated in group discussions and that she had

tested positive for opiates in April 2012.  (Tr. 459.)

On August 1, 2012, counselor Don Mendoza, M.A., L.P.C., S.P.T. ("LPC Mendoza"),

reported that Plaintiff denied auditory or visual hallucinations, that she resided in a shelter, and

that she "[l]ack[ed] social support[]."  (Tr. 461, 463-64.)  In an undated report, LPC Mendoza noted

that Plaintiff reported having auditory hallucinations, "various detox[ification] hospitalizations in

the past[,]" and "fluctuating mood states."  (Tr. 465.)  However, in two other August 2012 visits,

while LPC Mendoza reported that Plaintiff reported a "good" mood, cooperative behavior, and

good eye contact, he also reported that Plaintiff seemed "unwilling" to participate in additional

peer support meetings because she feared they might "trigger her to relapse."  (Tr. 467) (internal

quotation marks omitted.)  Finally, during a September 2012 examination, Dr. Cruickshank noted

that Plaintiff was cooperative, her mood was neutral, she had no signs of auditory or visual

hallucinations, and she had a GAF of sixty-five (mild psychiatric symptoms).  (Tr. 475); *see supra*

note 2.  However, in a progress note from the same date, Dr. Cruickshank reported that Plaintiff reported feeling sad and that she "stay[ed] in bed most days."  (Tr. 468.)

### c.   The Social Security Administration's Requested Examinations

In June 2012, the Social Security Administration (the "Administration") requested that Dr. Victoria Miller, Ph.D. ("Dr. Miller") examine Plaintiff.  (*See* Tr. 19, 443-45.)  In her Psychological evaluation, Dr. Miller noted that Plaintiff stated that Plaintiff had stopped working at KFC because "she found it difficult to be around people."  (Tr. 443.)  Plaintiff told Dr. Miller that she had a history of "severe mood swings," "paranoia," "auditory hallucinations," and "drug abuse."  (Tr. 443.)  Plaintiff also reported to Dr. Miller that she has had psychiatric symptoms since she was seven or eight years old.  (Tr. 443.)  Dr. Miller noted that Plaintiff dropped out of high school in the ninth grade because "she had problems getting along with people."  (Tr. 444.)  While Dr. Miller noted that Plaintiff was coherent, fully oriented, made eye contact, and spoke fluently, she also reported that Plaintiff spoke and followed directions at a slow rate.  (Tr. 444.)  Additionally, Dr. Miller reported that Plaintiff could count by threes to thirty, remember the names of the current and former President, spell "world" forward, but not in reverse, recall three objects immediately and two out of three after five minutes, and recall six digits forward and three digits backwards. (Tr. 444.)  While Dr. Miller noted that Plaintiff had no signs of thought disorder and that Plaintiff's mood was "neutral[,]" she also reported that Plaintiff's judgment was "limited" and her "impulse control fair."   (Tr. 444.)  Moreover, Dr. Miller noted that while Plaintiff denied social isolation and stated that she could take care of herself, Plaintiff also indicated that Plaintiff and her daughter both completed household chores and went shopping together, and that she required some help in the daily management of her activities.  (Tr. 444.)  Finally, Dr. Miller reported that Plaintiff had a guarded prognosis and opined that, given Plaintiff's history of drug abuse, Plaintiff would benefit

from "support with management of any funds until [Plaintiff] is in full remission." (Tr. 445.) Notably, Dr. Miller gave Plaintiff a GAF score of fifty, indicating serious psychiatric symptoms. (Tr. 445.)

Consultative psychologists, Drs. Leslie Williams, Ph.D., and Jane Shapiro, Ph.D. ("Dr. Shapiro"), reviewed Plaintiff's DIB application and medical record in June 2012 and November 2012, respectively. (*See* Tr. 82-101.) They both opined that Plaintiff has moderate to non-significant limitations in both social functioning and concentration. (Tr. 88, 98-99.) Dr. Shapiro specifically noted Plaintiff's July 2012 drug relapse, but then concluded that "[t]here is no evidence of any substance abuse disorder." (Tr. 99-100.)

### d.   *Function Reports*

Plaintiff submitted two function reports with her application for SSI. (*See* Tr. 223-30, 249-56.) In Plaintiff's first function report from January 2012, Plaintiff noted that she: takes care of her grandchildren by changing their diapers, feeding them, and playing with them; sleeps "all day into the night"; and eats dinner "once in a while." (Tr. 223.) Moreover, Plaintiff indicated that: her daughter has to remind her to get out of bed, wash, eat, take her medication, and give her money to pay the bills; cooking complete meals takes more of an effort with her illness; and that she can do house chores only "on good days." (Tr. 225-26.) Plaintiff also reported that when she goes out, she usually has someone with her because she sometimes forgets where she is going. (Tr. 226.) Lastly, Plaintiff noted that she only interacts with her family, that she has problems with memory, concentration, getting along with others, completing tasks, and following instructions, and that she handles stress by "retreat[ing] internally." (Tr. 227-29.) Plaintiff noted in her second function report from September 2012 that she used to be able to take care of her kids, go to the store by herself, and talk to people before her illness, but now "all [she] does is sleep." (Tr. 250.)

Plaintiff also reported that she often needs her daughter's help because "[Plaintiff] burns things" while cooking.  Plaintiff noted that she forgets to pay bills and needs help with spelling.  Lastly Plaintiff reported that she struggles to get along with authority figures.  (Tr. 251-52, 255.)

Plaintiff's daughter, Chyryssa McDonald, submitted a third-party function report in January 2012.  (*See* Tr. 231-38.)  Ms. McDonald indicated that Plaintiff is in bed all day unless she requests that Plaintiff help with chores or that she watch Plaintiff's grandchildren.  (Tr. 231.) Ms. McDonald also noted that Plaintiff: used to be able to be in large crowds; needs reminders to eat, take her medication, and pay her bills; burns her food while cooking; and, socializes only with her family.  (Tr. 232-33, 236.)  Lastly, Ms. McDonald reported that Plaintiff has a poor memory, a short attention span, difficulty completing tasks, trouble concentrating, and is rude to non-family members.  (Tr. 236.)

### e.   *Plaintiff's Testimony*

At the hearing before ALJ Miller on May 29, 2013, Plaintiff testified that voices in her head prevented her from doing any job, that she has problems being around people, and that she had forgotten that she worked at KFC until she filled out her SSI application.  (Tr. 32, 34.)  Plaintiff also stated that she has attempted suicide six times, that the voices in her head get softer with medication, and that her doctor considered increasing the dosage for her monthly injection of Invega to eliminate the voices altogether.  (Tr. 35.)  Moreover, Plaintiff testified that she constantly wants to sleep, that she had gained thirty pounds in the previous year, that she cannot concentrate when she is around people or with the voices in her head, and that her medication causes sleepiness and frequent urination.  (Tr. 36-37.)  Additionally, Plaintiff testified that she cannot live by herself because of poor memory.  (Tr. 38.)  Plaintiff also stated that she does not have friends, and that she only visits a certain friend's house when he is not home so that Plaintiff can escape her

daughter's company.  (Tr. 39.)  Plaintiff claimed that she and her daughter manage the household finances, that she attends weekly support group meetings, that she can clean the house, and that she is unable to concentrate enough to read.  (Tr. 40-42.)  Lastly, Plaintiff testified that her schizophrenia started when she was a child before she started using drugs, and that she did not complete the ninth grade because of depression.  (Tr. 44.)

### f. *Vocational Expert's Testimony*

During the May 2013 hearing, vocational expert Jennifer Dizon ("VE Dizon"), testified that Plaintiff does not have any past relevant work in the last fifteen years.  (Tr. 47.)   VE Dizon also opined that a hypothetical person with Plaintiff's limitations could perform work as a kitchen helper, a marking clerk, or a hand packer.  These limitations include: Plaintiff's education, training, work experience, residual functional capacity to perform work at all exertional levels but would be off task five percent of the time, with non-exertional limitations allowing only for the performance of simple, routine, and repetitive tasks involving simple decisions, occasional changes in routine, and occasional and superficial contact with others.  (Tr. 47-48.)  Additionally, VE Dizon testified that these jobs exist in substantial numbers in the national economy.  (Tr. 48.)  VE Dizon stated that she could not "specifically decipher[]" which marking clerk jobs required the hypothetical person to work in the front of the store with the general public or the back of the store.  (Tr. 53-54.)  VE Dizon testified that a kitchen helper and a hand packer perform their jobs "fairly independently" with only occasional or superficial contact with others.  (Tr. 57, 59.)  Lastly, VE Dizon opined that it would be difficult for a kitchen helper, marking clerk, or hand packer "to keep up with the demands" of the job if they were off task ten percent of the time.  (Tr. 62-65.)

## II.   LEGAL STANDARD

### A. Standard of Review

In Social Security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal citation and quotations omitted). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (internal quotation marks omitted)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976) (internal quotation marks omitted)).  Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir. 1984) (citations omitted).

**B. The Five–Step Disability Test**

A claimant's eligibility for social security benefits is governed by 42 U.S.C. § 1382.  An individual will be considered disabled under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months.  42 U.S.C. § 423(d)(1)(A).  The impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A claimant must show that the "medical signs and findings" related to his or her ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . . "  42 U.S.C. § 423(d)(5)(A).

To make a disability determination, the ALJ follows a five-step sequential analysis.  20 C.F.R. §§ 404.1520(a), 416.920(a); *see also Cruz*, 244 F. App'x at 480.  If the ALJ determines at

11

any step that the claimant is or is not disabled, the ALJ does not proceed to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Step one requires the ALJ to determine whether the claimant is engaging in substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  SGA is defined as work that "[i]nvolves doing significant and productive physical or mental duties . . . for pay or profit."  20 C.F.R. §§ 404.1510, 416.910.  If the claimant engages in SGA, the claimant is not disabled for purposes of receiving social security benefits regardless of the severity of the claimant's impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the individual is not engaging in SGA, the ALJ proceeds to step two.

Under step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meets the duration requirement found in Sections 404.1509 and 416.909. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or a combination of impairments is not severe when medical and other evidence establishes only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to work.  20 C.F.R. §§ 404.1521, 416.921; Social Security Rule ("SSR") 85-28, 96-3p, 96-4p.  An impairment or a combination of impairments is severe when it significantly limits the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If a severe impairment or combination of impairments is not found, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the ALJ finds a severe impairment or combination of impairments, the ALJ then proceeds to step three.

Under step three, the ALJ determines whether the claimant's impairment or combination of impairments is equal to, or exceeds, one of those included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If an

impairment or combination of impairments meets the statutory criteria of a listed impairment as well as the duration requirement, the claimant is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If, however, the claimant's impairment or combination of impairments does not meet the severity of the listed impairment, or if the duration is insufficient, the ALJ proceeds to the next step.

Before undergoing the analysis in step four, the ALJ must determine the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(a), 404.1520(e), 416.920(a), 416.920(e).  An individual's RFC is the individual's ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments.  20 C.F.R. §§ 404.1545, 416.945.  The ALJ considers all impairments in this analysis, not just those deemed to be severe.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p.  After determining a claimant's RFC, step four then requires the ALJ to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If the claimant is able to perform his or her past relevant work, he or she will not be found disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  If the claimant is unable to resume his or her past work, the disability evaluation proceeds to the fifth and final step.

At step five, the ALJ must determine whether the claimant is able to do any other work, considering his or her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  Unlike in the first four steps of the analysis where the claimant bears the burden of persuasion, the burden shifts to the ALJ at step five to determine whether the claimant is capable of performing an alternative SGA present in the national economy.  20 C.F.R. §§ 404.1520(g)(1) (citing 404.1560(c)), 416.920(g)(1) (citing 416.960(c)); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).  At this point in the analysis, the Social Security Administration ("SSA") is

"responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's RFC] and vocational factors." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). If the claimant is unable to do any other SGA, he or she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.   **DISCUSSION**

ALJ Miller applied the Five-Step Disability Test and he determined that Plaintiff was not disabled under the relevant portions of the Act. (*See* Tr. 14-23.) Specifically, ALJ Miller determined: (1) that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1"; (2) that Plaintiff "has the [RFC] to perform a full range of work at all exertional levels[,]" but with some limitations; and (3) that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (Tr. 14, 16, 21) (citations omitted). This Court finds that substantial evidence does not support the ALJ's decision. Therefore, this Court remands this matter to the ALJ for further proceedings consistent with this Opinion.

At step one of the disability analysis, ALJ Miller found that Plaintiff had not engaged in SGA since February 1, 2012, the amended alleged onset date of Plaintiff's disability. (Tr. 14); *see* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1571 *et seq.*, 416.971 *et seq.*

At step two, ALJ Miller determined that Plaintiff suffered from the following severe impairments: "schizoaffective disorder, and cocaine and opioid abuse in partial remission."[3] (Tr. 14); *see* 20 C.F.R. §§ 404.1520(c), 416.920(c). ALJ Miller found that these impairments were

---

[3] ALJ Miller also determined that Plaintiff is obese. However, he found that Plaintiff's obesity was a "non-severe impairment" because Plaintiff did not allege limitations from her obesity and the record did not support such a finding. (Tr. 14); *see* 20 C.F.R. § 416.921, SSR 96-3p. Regardless, Plaintiff stipulated that she had "no physical impairments, just [] mental." (Tr. 47.)

14

"severe" because they "have lasted at a 'severe' level for a continuous period of more than [twelve] months." (Tr. 14.)

At step three, ALJ Miller determined that Plaintiff's mental impairments did not equal or exceed the impairments included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.926). (Tr. 14.) ALJ Miller found that "[Plaintiff's] mental impairments, considered singly and in combination, [did] not meet or medically equal the criteria of listings 12.03, 12.04 and 12.09." (Tr. 14.) "The required level of severity for [the] disorders [listed under Sections 12.03 and 12.04] is met when the requirements in both [Paragraphs] A and B are satisfied, or when the requirements in [Paragraph] C are satisfied." 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.03, 12.04.

ALJ Miller first concluded that Plaintiff's mental impairment failed to satisfy the Paragraph B criteria of Sections 12.03 and 12.04 because the impairment did not result in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Tr. 15.) In considering these factors, ALJ Miller found that Plaintiff has: (1) mild restriction in her daily living; (2) moderate difficulty in her social functioning; (3) only moderate difficulties with her concentration, persistence, and pace; and (4) experienced one to two episodes of decompensation, which have been of extended duration, when Plaintiff underwent heroin detoxification in July 2012. (Tr. 15.)

This Court finds that the ALJ did not sufficiently consider the fact that Plaintiff rarely interacts with anyone outside of her family, and that she lacks any intimate relationships.[4] (Tr. 39,

---

[4] The record indicates that the Hudson County Probation office referred Plaintiff to group therapy sessions following her jail sentence for theft. (Tr. 445, 459.) Plaintiff was unwilling to participate in additional peer support meetings because she feared they might "trigger her to relapse." (Tr. 467.)

41, 236.)  Additionally, Plaintiff reported to consultative psychologist Dr. Miller that she quit her job at KFC in 2009 after only two or three weeks because "she found it difficult to be around other people," and that she dropped out of high school in the ninth grade because "she had problems getting along with other people."  (Tr. 31, 208, 443-44.)  The ALJ also did not address LPC Mendoza's findings that Plaintiff "[l]ack[ed] social support[]."  (Tr. 464.)  In determining Plaintiff's concentration limitations, the ALJ cited only to consultative psychologist Dr. Miller's single examination of Plaintiff in June 2012 thereby failing to give sufficient weight to the findings of other treating psychiatric professionals.  (Tr. 15, 444.)  Indeed, NP Okaine reported Plaintiff's chronic "non-command voices of screaming/noise," and LPC Mendoza noted that Plaintiff reported having auditory hallucinations and "fluctuating mood states."  (Tr. 373, 465.)  A psychiatric emergency room physician reported in September 2011 that Plaintiff complained of hallucinations lasting three months and that Plaintiff wanted the "yelling and screaming in [her] head" to stop.  (Tr. 465.)  Plaintiff has also been on a steady regimen of Prozac, Seroquel, Ambien, Risperdal, Cogentin, and monthly injections of Invega.  (Tr. 382, 431, 437, 447, 454, 456, 462, 470.)

Further Paragraph B analysis is needed with respect to Plaintiff's episodes of decompensation.  "Repeated episodes of decompensation, each of extended duration[,]" entails three episodes within one year, or an average of once every four months, each lasting for at least two weeks.  (Tr. 15.)  ALJ Miller failed to consider whether Plaintiff's six suicide attempts qualified in his finding that Plaintiff experienced only one to two episodes of extended duration. (Tr. 15, 34-35.)  Additionally, while the ALJ mentioned that Plaintiff underwent detoxification for heroin in July 2012, he did not give sufficient weight to Plaintiff's approximately thirty-year history of drug usage, including the fact that she sniffed fifteen bags of heroin per day for twenty

16

years.  (Tr. 285, 463, 465, 467, 476.)  Lastly, Plaintiff was hospitalized "more than" five times for her schizoaffective disorder.  (Tr. 480.)

The ALJ determined that Plaintiff's mental impairment did not meet the Paragraph C criteria under Sections 12.03 and 12.04 because "[t]here is no medical evidence or testimony that [Plaintiff] has experienced" any of the following criteria: "repeated episodes of decompensation, a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or changes in the environment would be predicted to cause [Plaintiff] to decompensate, or a current history of [one] or more years' inability to function outside a highly supportive living arrangement." (Tr. 15-16.)  The record requires further consideration to rebut the evidence that Plaintiff was not able to live on her own, and that Plaintiff's daughter will not let her cook on her own because Plaintiff burned food.  (Tr. 38, 233, 251.)  Moreover, the ALJ did not sufficiently contradict the medical record evidence of Dr. Zdena Rubin, who reported in July 2012 that Plaintiff was homeless, or a counselor's note that Plaintiff reported during a group therapy session that she had "unstable housing issues."  (Tr. 457, 476-77.)  Accordingly, further step three analysis is required in light of these gaps in medical equivalence analysis.

Before undergoing the analysis in step four, the ALJ determined Plaintiff's RFC.  (*See* Tr. 16-21); *see* 20 C.F.R. §§ 404.1520(e), 404.1545.  ALJ Miller concluded that Plaintiff has the RFC[5] "to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] is limited to performing simple, routine, and repetitive tasks can [sic] be explained, which involve making simple decisions, only occasional changes in routine, and

---

[5] Plaintiff stipulated that she had "no physical impairments, just [] mental" (Tr. 47); therefore, this Opinion considers only Plaintiff's mental impairments in ALJ Miller's analysis of Plaintiff's RFC.

involves occasional and superficial contact with others that is further entry level and unskilled." (Tr. 16.)  Additionally, "[Plaintiff] would be off task [five percent] of the time."  (Tr. 16.)

The ALJ's RFC determination did not give a sufficient basis for the rejection of certain evidence in the record.  In evaluating the evidence, the ALJ must consider the whole record, and "give some indication of the evidence which he rejects and his reason for discounting such evidence."  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *see Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). While deference is afforded to the ALJ's findings, "[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705.  Here, ALJ Miller did not sufficiently contradict the examination reports of Plaintiff's treating psychiatrists, Dr. Cruickshank and Dr. Rubin.  (Tr. 445.)  Plaintiff's multiple treatments with Dr. Cruickshank in 2012 reveal that Plaintiff had symptoms consistent with schizoaffective and bipolar disorders.  (Tr. 460-81.)  Instead of contradicting this evidence, the ALJ's opinion offers the following conclusory statement: "[l]ittle weight is given to Dr. Cruickshank's GAF assessment of [forty-five,] . . . . which the evidence does not support."  (Tr. 20.)  The ALJ also "afforded little weight" to Dr. Cruickshank's opinion that Plaintiff could not work full-time for eight hours per day, that Plaintiff is a likely candidate for SSI, and that Plaintiff would likely be disabled for a period of twelve months or more.  (Tr. 20, 481.)  Additionally, the ALJ did not evaluate the following findings from Dr. Cruickshank, Dr. Rubin, LPC Mendoza, and Intern Doering:

- Dr. Rubin's reports during multiple July 2012 visits that Plaintiff was homeless and sniffed fifteen bags of heroin per day for twenty years.  (Tr. 463, 465, 467, 476, 478.)
- Intern Doering's July 5, 2012 progress note that Plaintiff "continues to reside at St. Lucy's shelter and continues to pursue stable housing."  (Tr. 457.)
- Plaintiff's report during a July 10, 2012 group therapy session at Jersey City Medical Center that she had "unstable housing issues."  (Tr. 457.)

- LPC Mendoza's August, 2012 report that Plaintiff resided in a shelter and "[l]ack[ed] social support[]." (Tr. 461, 463-64).
- LPC Mendoza's note that Plaintiff reported auditory hallucinations, "various detox[ification] hospitalizations in the past[,]" and "fluctuating mood states." (Tr. 465.)
- LPC Mendoza's August 2012 report that Plaintiff seemed "unwilling" to participate in additional peer support meetings because she feared they might "trigger her to relapse. (Tr. 467.)
- Dr. Cruickshank's September 2012 report that Plaintiff complained of feeling sad and that she "stay[ed] in bed most days." (Tr. 468.)

Instead of controverting the reports of these treating psychiatric professionals, the ALJ afforded "[l]ittle weight" to both the treating psychiatrists *and* the consultative psychologist. (Tr. 20.) Indeed, "[w]here a report of a treating physician conflicts with that of a consulting physician, the ALJ must explain on the record the reasons for rejecting the opinion of the treating physician." *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (the Court found that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence") (citing *Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir. 1979)). Here, the ALJ gives "[l]ittle weight" to Dr. Miller's GAF score of fifty (consistent with serious psychiatric symptoms), finding that the score was "inconsistent with Dr. Miller's own examination results" that Plaintiff could remember two of three objects after five minutes. (Tr. 19-20, 445.) The ALJ also found that this single test sufficiently contradicted Dr. Cruickshank's objective medical opinion that Plaintiff is unable to work full-time, is a likely candidate for SSI, and would be disabled for the foreseeable future. (Tr. 20, 481.) However, the ALJ's cite to a single psychologist's examination report—indeed, a single test in that examination—is insufficient to contradict treating psychiatrists' findings during Plaintiff's multiple visits with them.[6] Lastly,

---

[6] The ALJ also cited Plaintiff's report indicating that she has contact with her granddaughter and that she goes on shopping trips with her daughter. (Tr. 20, 444.) However, the record reflects that Plaintiff has complained of "unstable housing issues," and Plaintiff testified that she was not able to live on her own, that she did not have any

the ALJ also failed to acknowledge Dr. Miller's ultimate recommendation that, given Plaintiff's "guarded" prognosis and her "very recent history of drug use, Plaintiff would benefit from support with management of any funds until she is in full remission." (Tr. 445.) Accordingly, additional analysis is needed to controvert the objective medical evidence of Plaintiff's treating psychiatrists and mental health professionals.

The ALJ also failed to give sufficient weight to medical record evidence that pre-dated Plaintiff's amended onset date; specifically, Plaintiff's daughter's third-party function report. (*See* Tr. 231-38.) The regulations require the ALJ to consider "evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish [Plaintiff's] impairment severity." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00D. This type of evaluation is imperative in cases of psychiatric impairment and chronic mental disorder, where "[t]he results of a single examination may not adequately describe [a Plaintiff's] sustained ability to function[,]" and where "overt symptomatology may be controlled or attenuated by psychological factors." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00E, F. Here, the ALJ erred in giving "little weight" to Plaintiff's daughter's January 5, 2012 third-party function report merely because Plaintiff amended her onset date to February 1, 2012. (Tr. 21, 32, 231.)

At step five, the ALJ found that Plaintiff can perform work that exists in significant numbers in the national economy. (Tr. 21); *see* 20 C.F.R. §§ 404.1569, 416.969. However, in reaching this conclusion, ALJ Miller gave improper weight to VE Dizon's testimony at the May 2013 hearing, finding that the testimony was "consistent with the information contained in the [Dictionary of Occupational Titles ("DOT")]." (*See* Tr. 47-69); *see also* SSR 00-4p. The ALJ

---

friends outside of her family, and that her daughter takes care of the money. (Tr. 38-42, 457.) More analysis is needed to contradict this evidence.

relied on VE Dizon's unsupported conclusions.  Specifically, VE Dizon opined, without stating a basis for her opinion, that the jobs kitchen helper, hand packer, and marking clerk can be performed independently and all involve only "occasional superficial contact with others."[7]  (Tr. 53-54, 57, 59.)   However, the DOT descriptions of each job infer that they may require at least some instruction and interaction with others, and entail numerous tasks that are not always repetitive or routine.  *See* Packager, Hand, DICOT 920.587-018, 1991 WL 687916; Kitchen Helper, DICOT 318.687-010, 1991 WL 672755 ("Washes and peels vegetables, using knife or peeling machine"); Marker, DICOT 209.587-034, 1991 WL 671802 ("May . . . notify supervisor of discrepancies.").  Indeed, VE Dizon testified that she could not "specifically decipher[]" which marking clerk jobs required the hypothetical person to only be in the back of the store versus interaction with the general public in the front of the store.  (Tr. 53-54.)  Additionally, VE Dizon did not state a basis for her opinion that these entry-level positions "generally" afford their workers two weeks' vacation, the ability to be ten percent off-task, and sick time that varies from employer to employer. (Tr. 64-65, 68-69.)  Accordingly, because the factual findings are not supported by substantial evidence, the Commissioner's decision will be remanded for further proceedings.

## CONCLUSION

Because this Court finds that ALJ Miller's factual findings were not supported by substantial credible evidence in the record, the Commissioner's decision is **REMANDED** for further review consistent with this Opinion.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:      Parties

---

[7] At one point during the May 2013 hearing, VE Dizon stated that she was basing her opinion on "speaking with other [VEs]"; however, this is not a sufficient basis for support.  (Tr. 54.)